[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 27, 2004
THOMAS  K. KAHN
CLERK

_____

No. 02-13446

_____

D.C. Docket No. 01-00369 CV-DMM

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

versus

DIVERSIFIED CORPORATE CONSULTING GROUP,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 27, 2004)**

Before TJOFLAT and CARNES, Circuit Judges, and CONWAY*, District Judge.

PER CURIAM:

_____

* Honorable Anne C. Conway, United States District Judge for the Middle District of
Florida, sitting by designation.

This action was brought in the district court by the Securities and Exchange Commission ("SEC") against Diversified Corporate Consulting Group, L.C. ("Diversified"),[1] Joseph Radcliffe, William A. Calvo III, and Jerome Rosen.  The SEC's four-count complaint alleged that these defendants sold unregistered securities—shares of common stock of Systems of Excellence, Inc. ("SOE")—in violation of §§ 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77e(c), and manipulated the market for SOE common stock in violation of § 17(a) the 1933 Act, 15 U.S.C. § 77q(a), § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5.[2]  The defendants answered the complaint, asserted affirmative defenses not relevant here, and denied liability.  After the parties engaged in  discovery, Radcliffe and the SEC reached a settlement and

_____

[1] Diversified is a limited liability company organized under Florida law.

[2] The SEC's complaint, is a typical shotgun pleading, see Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1296 n.9 (11th Cir. 2002), in that each count incorporates by reference every allegation preceding it.  Count Four, therefore, is an amalgamation of Counts One, Two, and Three.  Separating out the allegations of the complaint, and ignoring the incorporation by reference tactic of the complaint's drafter, so that each count states a separate claim or alternative claims for relief, see Fed. R. Civ. P. 8(e)(2), we discern the following claims.  Count One charges Rosen with selling unregistered securities, 15 U.S.C. §§ 77e(a), 77e(c).  Count Two charges Diversified, Radcliffe, and Calvo with the same violation.  Count Three charges Diversified, Radcliffe, and Rosen with market manipulation, in violation of 15 U.S.C. §§ 77q(a), 78j(b), and 17 C.F.R. 240.10b-5.  Count Four charges Rosen with "scalping," in violation of 15 U.S.C. §§ 77q(a), 78j(b), and 17 C.F.R. 240.10b-5.

agreed to the entry of a consent decree.[3]  Thereafter, the SEC moved for summary

judgment on its Count Two claims against Diversified and Calvo for selling

unregistered shares of SOE stock.  The court found that the two defendants had

made such sales and granted SEC's motion on the issue of liability.  It deferred

ruling on the profits the defendants should be required to disgorge and the civil

penalties they should be required to pay and instructed the parties to come to an

agreement on how those remedies issues should be handled.  The parties agreed

that the court should entertain the remedies issues following the jury trial on

Counts Three and Four.

At trial, the SEC, after presenting its case-in-chief, moved the court for

leave to amend its complaint to add a claim against Diversified for "scalping" in

violation of 15 U.S.C. §§ 77q(a), 78j(b), and 17 C.F.R. 240.10b-5.  Over

Diversified's objection, the court granted the motion.  At the end of the day, the

jury found Diversified and Rosen liable on all claims.  A few days after receiving

the jury's verdicts, the court held a remedies hearing, after which it entered orders

requiring that Diversified and Calvo disgorge $2,511,145 and that Rosen disgorge

$992,891.  The court's orders also contained sweeping injunctive provisions

---

[3] The judgment required Radcliffe to disgorge $539,000 and contained several injunctive provisions not relevant here.

3

barring the defendants from, among other things, engaging in further securities laws violations.

Diversified now appeals.[4]  First, Diversified contends that the district court erred in granting the SEC summary judgment on the Count Two claim that it sold unregistered SOE shares.  According to Diversified, it did not know that the shares were unregistered and its lack of knowledge constituted an affirmative defense that the court should have submitted to the jury.  Second, Diversified appeals the judgment on Count Three.  It contends that the court should have dismissed Count Three as time barred, granted it judgment as a matter of law at the close of the evidence, or alternatively, afforded it a new trial due to juror misconduct.  Third, Diversified challenges the court's decision allowing SEC to amend its complaint to include a claim of scalping.  Finally, Diversified questions the remedies the court imposed.

I.

In 1995, Charles Huttoe was the major stockholder of SOE.  The company was failing and the price of its shares, which were traded "over the counter,"[5] had

---

[4] Calvo's appeal is addressed in an opinion released simultaneously herewith; Rosen did not appeal.

[5] The "over-the-counter" market is the "market for securities that are not traded on an organized exchange."  Black's Law Dictionary 1130 (7th ed. 1999).  Trading of over-the-counter securities usually "occurs through telephone or computer negotiations between buyers and

fallen to around twenty five cents per share.  In an effort to increase the price of

SOE's shares and make a quick profit from selling his shares, Huttoe devised a

"pump and dump" scheme.  Because he could not accomplish his objective alone,

he enticed several others—none of them SOE shareholders at the time—to join the

scheme.  Three of these individuals, Joseph Radcliffe, William A. Calvo III, and

Theodore Melcher, were principals of Diversified Corporate Consulting Group,

L.C. ("Diversified"),  and one, Jerome Rosen, was a stock trader[6] and a "market

maker"[7] in SOE stock.  We refer to these individuals and Diversified collectively

as "the Conspirators."[8]  For helping him execute the pump and dump scheme,

Huttoe gave the Conspirators shares of SOE stock that had not been registered and

were unrestricted on their face and thus freely tradable (the "unregistered shares").

The scheme was executed in three steps.  The first step involved the creation

of the unregistered shares.  Huttoe had the SOE Board of Directors authorize the

---

sellers."  Id.

[6] Rosen had been registered with the National Association of Securities Dealers since 1975.

[7] A "market-maker" is "[o]ne who helps establish a market for securities by reporting bid-and-asked quotations."  Black's Law Dictionary 984 (7th ed. 1999).  A market maker in the over-the-counter market is "a dealer who, with respect to a security, routinely enters quotations in an interdealer communication system or otherwise and is willing to buy and sell securities for the dealer's own account."  Id.

[8] Others not named in this opinion and not before us in this appeal were members of the conspiracy.

issuance of millions of facially-unrestricted shares.  Huttoe then instructed the "transfer agent" to issue such shares to the Conspirators.  Huttoe induced the transfer agent to issue the shares by representing that the shares had been registered with the SEC.[9]  The shares thus appeared to be freely tradable.

The second step of the scheme was to pump up the price of SOE's shares so that investors would be induced to buy them.  The pumping occurred in two ways.  First, Rosen began to raise his "bid" price for SOE shares.  To others who were making a market in SOE stock and to the investing public, raising the bid price indicated that there was a demand for the stock at that price.  Rosen raised his bid price repeatedly, even when it was higher than the bid price announced by other market makers and there was no demand for the stock.  This practice distorted the market because Rosen, who was essentially bidding against himself, was sending a false signal to investors—false in the sense that he was not raising his bid to meet a genuine demand for SOE shares.  The second way in which the Conspirators pumped up the price of SOE shares was to have SOE issue press releases that falsely portrayed its stock as a good investment, and by having Theodore Melcher, who published a daily stock-touting newsletter called SGA  Goldstar Whisper Stocks Report, issue false information about SOE's prospects and strongly

---

[9] Huttoe provided the transfer agent with false SEC registration statements.

recommend that investors purchase SOE. Investors duped by the false information placed orders to Rosen (and to other market makers who were not part of the conspiracy) for shares of SOE based on his "ask" price, which was as artificially inflated as his "bid" price.[10] The false press releases, Melcher's touting, and Rosen's activity worked hand in hand synergistically. Within a few months, the price of a share of SOE stock increased from $0.25 to $4.50.

The third and final step was the dumping. As SOE and Melcher showered the investing public with false information and Rosen supported SOE's price, the Conspirators provided the shares the investors were demanding by unloading their unregistered shares. This netted them millions of dollars in illicit profits.

## II.

As an initial matter, we must decide whether the appellant is Diversified Corporate Consulting Group, L.C., in its incarnation as a Florida limited liability company ("Diversified Florida"), a Delaware limited liability company ("Diversified Delaware"), or both. At oral argument, we asked the parties to submit a joint letter addressing this issue, but they were unable to reach an

---

[10] Sometimes Rosen lacked the shares to fill the buyers' orders, so he sold short at an inflated price. In a rising market, selling short can be risky because the seller may not be able to cover his sales by purchasing the needed shares at a price equal to or less than the price of the short sale. Rosen eliminated this risk through an agreement with Diversified whereby Diversified supplied Rosen with shares at a price that would guarantee him a profit.

7

agreement.

According to the findings of fact the district court issued following the remedies hearing, Diversified Florida was formed in 1995 and dissolved in September 1996. Diversified Delaware was formed in March 1996, and took over the assets and liabilities of Diversified Florida. The complaint names only Diversified Florida as a defendant, however.[11] The SEC contends that throughout the proceedings in the district court, Diversified Florida's counsel was actually representing Diversified Delaware as well, and that we should therefore treat the district court's judgment as if it had been entered against the Delaware entity.

The problem with the SEC's argument is that it knew well before the trial that Diversified Delaware was a separate entity and that it was Diversified Florida's successor in interest. The SEC, however, took no steps to have the Delaware entity made a party defendant. The SEC points to no authority, and we are unaware of any, for the proposition that a party who is not named in the plaintiff's complaint, who is not served with process, and who never made a formal appearance in the district court may nonetheless be treated by this court as a party defendant and, as such, bound by the final judgment the district court

---

[11] Although the name of both entities was "Diversified Corporate Consulting Group," the complaint averred that Diversified was "a Florida limited liability company formed in May 1995."

8

entered.

It may be that Diversified Delaware is the fraudulent transferee of Diversified Florida's assets and may have to turn them over to the SEC.  Whether such is the case, however, will have to await another day and another proceeding.  We turn now to Diversified's attack on the summary judgment the district court granted on Count Two and then to its challenges to Count Three and the remedies the court fashioned.

III.
A.

Count Two charged Diversified with selling unregistered SOE stock in violation of 15 U.S.C. §§ 77e(a) and 77e(c).  Diversified confesses to having sold the shares but seeks to avoid liability on the theory that it did not know that the securities were unregistered at the time it sold them.  Calvo raised the same argument in his companion appeal.  We rejected the argument Diversified now makes in an opinion issued contemporaneously with this opinion.  See SEC v. Calvo, No. 02-13445 (11th Cir. July 27, 2004).  We therefore reject it here.

B.

Citing 15 U.S.C. § 77m, Diversified contends that Count Three is barred by

the statute of limitations.[12]  Section 77m governs, <u>inter alia</u>, the time for filing private actions brought under 15 U.S.C. § 77*l* by persons purchasing unregistered securities.  The SEC's authority to bring an action against the seller of unregistered securities, however, is conferred by 15 U.S.C. § 77t.  Diversified argues that § 77m's limitations period should nevertheless apply to actions by the SEC under § 77t, because courts typically "borrow" an analogous statute of limitations where, as here, Congress has been silent.

As our opinion in <u>Calvo</u> states, "[w]hen the United States brings suit in its sovereign capacity, a statute of limitations does not ordinarily apply unless Congress has expressly provided otherwise." <u>Calvo</u>, mem. op. at 13.  When the SEC sues to enforce the securities laws, it is vindicating public rights and furthering public interests, and therefore is acting in the United States's sovereign capacity.  This is so even though the SEC seeks disgorgement as a remedy of the violation and even though the disgorged proceeds may be used to compensate the defendant's victims.

Because in bringing this action the SEC was acting in the sovereign capacity of the United States in enforcing its securities laws, no statute of limitations applies.  We therefore affirm the district court's refusal to treat the

---

[12]  Diversified contends that all of the SEC's claims are time-barred.

10

SEC's claims as time-barred.

## C.

At the close of all the evidence, Diversified moved the district court pursuant to Rule 50(b) of the Federal Rules of Civil Procedure to dismiss Count Three as a matter of law on the ground that the evidence failed to show that it manipulated the market for or participated in the market manipulation of SOE stock. The district court denied Diversified's motion. Diversified now asks that we reverse the court's decision and enter judgment in its favor on Count Three.

Rule 50(b) provides that

> [i]f . . . the [district] court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment . . . .

Diversified states in its brief that it moved for judgment as a matter of law at the close of all the evidence and that the district court denied the motion. Diversified does not tell us whether it renewed its motion after the entry of judgment.

The district court entered final judgment against Diversified on April 24, 2002. Fifteen days later, on May 10, 2002, Diversified filed a "Motion for Modification of Judgment." The motion was not filed within ten days of the entry

11

of judgment, as required by both Rule 50(b) and Rule 59(e) for a motion to alter or amend judgment.[13] Diversified's motion was therefore untimely. Moreover, the motion failed to renew Diversified's Rule 50(b) motion for judgment as a matter of law on Count Three. In sum, Diversified's argument that the court erred in denying its Rule 50(b) motion is fatally flawed.

### D.

As a fall back position in the event we do not direct the district court to dismiss Count Three, Diversified seeks a new trial on the ground that the district court abused its discretion by refusing to investigate an allegation of juror misconduct. The incident occurred during the first day of trial, while the jury was returning from the lunch recess. The court had declared the recess following the SEC's opening statement. After the jurors had assembled in the jury room, the court (in their absence) took up some housekeeping matters with counsel. At that time, Rosen's attorney told the court that it "ha[d] been reported to [him] that one of the lady jurors was overheard, inadvertently overheard, talking to one of the male jurors [saying] something to the [e]ffect [of] . . . 'I know we are not supposed to talk about this case, but it appears to be a slam dunk, an open and shut case.'"

---

[13] After eliminating weekends from the ten-day count as required by Federal Rule of Civil Procedure 6(a), Diversified had until May 8 to file its motion.

Rosen's attorney asked the court to question the two jurors. He added that if what had been reported to him turned out to be true, he would challenge the two jurors. If the comment "turned out to be more permeating than that, then [he] would move for a mistrial."

The court decided not to question the two jurors. It opted instead to give the entire panel a cautionary instruction. Thus, when the panel returned to the courtroom moments later, the court instructed them as follows:

> Remember, an opening statement is not evidence, it's simply a statement by the lawyer as to what he thinks the evidence is going to show, but the evidence is going to come in from witnesses and documents that are admitted into the record.
> And let me repeat to you, it's very important to wait until you've heard everything. It is natural perhaps to react to what one side says or what a witness says or even what a lawyer says in an opening statement, although that is not evidence, but you need to wait until you have heard everything. You need to hear the evidence from both sides, you need my instructions to you on the law, the lawyers will then get a chance to argue what they believe the evidence has shown, but you really can't form any kind of hard and fast conclusions at this point because you haven't heard anything, and it's very important not to begin the process of deliberations and to discuss the case before you have heard everything and until you are in a position to really make up your mind.
> And I know internally you may, you know, react to things and think things through as you hear them as the trial progresses, but particularly in a case where the plaintiff gets to go first and they have the burden of proof, they have to prove their case, they get to go first and then the defendants get to present their case, and you can't begin to form a conclusion based on only hearing one side's case. You need to make sure you've heard both sides.

The court then asked the jurors whether they could abide by the instruction, and all nodded yes, indicating that they could. After the court delivered this instruction, Rosen's attorney said nothing.

Diversified argues that the court's instruction was insufficient to cure the mischief the female juror had wrought with her comment and that due process required that the court question the two jurors and, if necessary, the entire panel. The problem Diversified faces in mounting this argument is that it neither objected to the court's handling of the situation nor joined in Rosen's objection.

Federal Rule of Civil Procedure 46 states:

> Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time of the ruling or order of the court is made or sought, makes known to the court the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefor; and, if the party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party.

The rule abolished the necessity for a party formally to take exception to the court's ruling after the court has overruled the party's objection. As Wright and Miller explain,

> If the district court takes action contrary to that requested by a party or overrules an objection made by a party, it no longer is necessary for the lawyer to go through the ritual of noting the exception. Some lawyers, particularly older members of the bar who grew up in a time

14

> when exceptions were important, persist in the habit of noting them on the record, but to do so is unnecessary and even may be improper.

9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2471 (2d ed. 1995) (footnotes omitted). Although formal exceptions are not now required, it is still necessary for counsel timely to object—for example, to the introduction of evidence or, as here, the adequacy of a jury instruction to remove prejudice—so as to provide the court an opportunity to take corrective action. Diversified's counsel stood silent. For all we know, counsel believed that the juror comment was directed at the SEC's case against Rosen, the securities dealer and market maker for SOE stock, not Diversified. Even if Diversified's counsel thought Rosen had the matter "covered" by asking the court to question the two jurors, if he thought the court's curative instruction was inadequate, he had a duty to speak up. After all, this is not a case where a party's failure to object is excused because, in the language of Rule 46, "a party has no opportunity to object to a ruling . . . at the time it is made." Diversified had an opportunity and elected not to pursue it.

In a case such as this—where the party foregoes an opportunity to object—we do not entertain the objection on appeal. Daikin Miami Overseas, Inc. v. Lee, Schulte, Murphy & Coe, P.A., 868 F.2d 1201, 1206 (11th Cir. 1989) ("If a

15

party has an objection, the party must make the objection. Failure to interpose an objection in a timely manner means that the party foregoes raising the issue."). In a rare case, we might notice plain error, but this is not a rare case.[14] In sum, we do not consider Diversified's challenge to the court's handling of the alleged juror misconduct.

E.

Diversified contends that the district court abused its discretion when it granted SEC's motion—made at the close of the SEC's case-in-chief—to amend its complaint[15] to add a claim for "scalping."[16] The SEC's motion did not spell out the allegations of the scalping claim in the motion itself or via an attached amended complaint containing the additional count as Count Five. Instead, we

---

[14] In an exceptional civil case, we might entertain the objection by noticing plain error. "[A]lthough the Civil Rules, unlike the Criminal Rules, do not contain a formal provision allowing the appellate courts to notice plain error, the appellate courts have held in a few cases that despite the absence of an objection they may consider an error so fundamental that it may have resulted in a miscarriage of justice." Wright & Miller supra § 2472 (footnotes omitted); cf. Holmes v. West Palm Beach Hous. Auth., 309 F.3d 752, 757 n.2 (11th Cir. 2002). Given the overwhelming evidence of liability in this case, we cannot say that the district court's action, if error, resulted in a miscarriage of justice.

[15] The court granted the amendment pursuant Federal Rule of Civil Procedure 15(b), which authorizes district courts to treat pleadings as amended to conform to the evidence.

[16] "Scalping" is a practice where an investment advisor who owns a security recommends that a client buy the security for long-term investment, and then immediately sells the security, profiting from the price increase that resulted from his own advice. SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 181, 84 S. Ct. 275, 277, 11 L. Ed. 2d 237 (1963).

have to look to the court's instructions to the jury to discern the contours of the claim.[17]  Diversified objected to the amendment.  Diversified did so not on the ground that the SEC's motion did not inform it of the contours of the scalping claim; instead, it objected on the ground that it did not have time to prepare a defense to the claim.

Since, as we note in part C, supra, Diversified did not preserve its Rule 50(b) motion for judgment as a matter of law by renewing it following the entry of judgment, the only relief Diversified could obtain if the district court abused its discretion by allowing the amendment is a new trial.  To obtain a new trial, of

_____

[17]  The court's scalping instructions, in their entirety, were as follows:

[T]he SEC contends that Diversified knowingly and deliberately sold shares of SOE stock while Melcher was recommending SOE stock and positively affecting its price without disclosing sales to subscribers.  Melcher, in turn, recommended SOE stock to the public without disclosing this arrangement.  The SEC contends that this constituted a fraud on the public.
. . .
If you find that the SEC proved by a preponderance of the evidence that the defendant Diversified knowingly and deliberately sold shares of SOE stock while knowing Melcher was recommending SOE stock and positively affecting its price without disclosing those sales to his subscribers, then you may find that Diversified engaged in an act, practice or course of business which operated or would operate as a fraud or deceit upon any person, thus satisfying the second element of the Section 10(b) claim against Diversified.
. . .
The SEC further contends that the same facts that demonstrate Diversified's knowing and deliberate sale of SOE stock while knowing Melcher was recommending SOE stock and positively affecting SOE's stock without disclosing those sales to his subscribers, in violation of Section 10(b), also satisfy the SEC's burden of proof for section 17(a) [l]iability.

17

course, Diversified would have to show prejudice. This it cannot do.

The reason why Diversified cannot show prejudice is that the jury's verdict on the scalping claim[18] gave the SEC no more relief than the jury's verdict provided on Count Three, the market manipulation claim. Both verdicts found Diversified liable for violating 15 U.S.C. §§ 77q(a), 78j(b) and Rule 10b-5. In the remedies stage of the case both verdicts led to the same relief: disgorgement, civil penalties, and injunctive provisions against violating the cited provisions of the securities laws. Thus, even if Diversified were correct that the district court should not have allowed the SEC to amend its complaint, Diversified cannot show prejudice because even without the scalping claim the relief ordered by the district court would be unchanged.

## IV.

Diversified contends that the district court erred in awarding disgorgement, civil penalties, and injunctive relief against it because it is a dissolved entity, has no ability to pay, and has "nothing to enjoin." One wonders how such an entity hires a lawyer, defends itself at trial, and takes an appeal, and why it would even bother to do so. As we see it, Diversified "doth protest too much."[19]

---

[18] The jury found for the SEC on the scalping claim via a special verdict. See Fed. R. Civ. P. 49.

[19] William Shakespeare, Hamlet, act 4, sc. 2.

18

Our review of the record indicates that the district court's finding that Diversified Florida is dissolved was based solely on what Calvo said on pretrial deposition and in his testimony at trial and the representation of Diversified's attorney. The parties' pretrial stipulation states that the Florida Secretary of State administratively dissolved Diversified Florida for failure to file an annual statement. Under Florida law, "[a] limited liability company administratively dissolved . . . may apply to the Department of State for reinstatement <u>at any time</u> after the effective date of dissolution." Fla. Stat. § 608.4482 (emphasis added). Furthermore, "[w]hen the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution and the limited liability company resumes carrying on its business as if the administrative dissolution had never occurred." <u>Id.</u> Finally, the record sheds no light on the extent of Diversified's assets or lack thereof. Whether Diversified has transferred its assets to Diversified Delaware and whether such transfer was for valuable consideration are issues not litigated in the district court.

Even if we were to agree with Diversified's argument that the relief ordered against it would be inappropriate against a no-longer-extant entity with no assets, there is nothing to prevent Diversified from reinstating itself, and it can do so merely by filing an application with the Florida Secretary of State. Given the

19

record before us, we would be hard put to say that the district court abused its discretion in granting SEC the relief it requested.

V.

Diversified's brief raises issues we have not discussed. We have not discussed them because they are patently meritless.

AFFIRMED.