# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 24, 2013      Decided November 26, 2013

No. 12-1241

MATTHEW J. COLLINS,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

On Petition for Review of Order of
the Securities & Exchange Commission

———

*Robert G. Heim* argued the cause for the petitioner. With him on the briefs was *Erik S. Jaffe*.

*Paul G. Alvarez*, Attorney, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Michael A. Conley*, Deputy General Counsel, *Jacob H. Stillman*, Solicitor, and *Mark Pennington*, Assistant General Counsel.

Before: KAVANAUGH, *Circuit Judge*, and WILLIAMS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: The Securities and Exchange Commission found that Matthew J. Collins failed to supervise a subordinate who violated various securities laws. The SEC imposed a civil penalty of $310,000 under § 15(b)(4)(E) of the Exchange Act, among other sanctions. Collins petitioned for review, arguing that the civil penalty was arbitrary and capricious and violated the Excessive Fines Clause of the Eighth Amendment. We uphold the Commission's decision.

\* \* \*

Collins does not challenge the factual findings in the Commission's decision, and we draw our account of his behavior in substance from that decision or from supporting testimony. He started work at Prime Capital Services, an SEC-registered broker-dealer, in 2001, and in due course was assigned to be the supervisor for Eric Brown, who sold financial products, including variable annuities. Collins received training relevant to his role as a supervisor, and signed declarations that he understood his supervisory responsibilities under firm policy, as well as state and federal law. Among his supervisory responsibilities, Collins was expected to review and approve Brown's transactions, and to complete a monthly report on Brown's activities.

The financial product in question, the variable annuity, is a hybrid, containing elements of an ordinary long-term investment in a security, an annuity, and life insurance. The contract owner, typically the annuitant, selects an investment, such as a mutual fund, for the purpose of growth. As with an ordinary mutual fund, the value of the investment depends on

the performance of the asset. However, as in an annuity, but unlike an ordinary mutual fund investment, a variable annuity begins to make periodic payments to the annuitant at a contractually set date. Moreover, taking a cue from a life insurance policy, if the annuitant dies before the payments begin, the variable annuity allows a beneficiary to receive the value of the original investment, less withdrawals, and the insurance company bears any losses in the underlying assets. See SEC, Variable Annuities: What You Should Know, *available at* http://www.sec.gov/investor/pubs/sec-guide-to-variable-annuities.pdf.

Signs of lapses in Collins's supervisory responsibilities first appeared in August 2003, when the Florida Department of Financial Services filed an administrative complaint against Brown. The complaint alleged, among other violations, that Brown had guaranteed certain customers a six-to-eight percent return on their investments. Brown failed to respond to the complaint and, on December 4, 2003, Florida revoked his insurance license. Brown lied to Collins about the nature of the administrative sanction, suggesting that it related to a "mishap with the state of Massachusetts," and that it was "no big deal." *In the Matter of Eric J. Brown*, *et al*., 2012 SEC LEXIS 636, Admin. Proc. File No. 3-13532, at \*11 (Feb. 27, 2012) ("SEC Opinion"). Collins did not investigate; in fact he allowed Brown to continue marketing variable annuities, even after he learned in February 2004 that Florida had revoked Brown's license.

After Brown appealed the license revocation, the state reinstated his license in April 2004, pending appeal, on the condition that he "not market annuities to individuals over the age of 65 years, who are not currently his clients." *Id*. at \*12. Despite the Florida restriction, Brown continued to market annuities to such individuals, and Collins tried to conceal Brown's violations by falsely listing himself as the

representative on the sales. Although Collins claimed that the clients were his, not Brown's, the Administrative Law Judge rejected this claim, pointing out that Brown's handwriting appeared throughout the customer accounts' documentation. And customers themselves testified that they had little or no interaction with Collins. An internal review by Prime Capital characterized Collins's conduct as a "complete lack of supervision," an assessment with which Collins agreed at the hearing. *Id*. at \*14.

The Commission found, in particular, that Brown sold variable annuities to five elderly customers during the period of his restricted license. One of the five later withdrew from the investment without penalty or other expense. Two evidently suffered no financial loss other than the cost of commissions collected by Collins. But two suffered substantial losses, first because of withdrawal penalties resulting from Brown's unauthorized transfers of funds from their pre-existing investments (over $60,000 between the two), and second in the form of lost value increases in those prior investments (allegedly totaling $459,000). These two later filed a complaint with the National Association of Securities Dealers ("NASD"), which led to an investigation by the state of Florida. Collins settled the state's administrative case by paying a $5,000 fine and by accepting a one-year probation on his insurance license. Prime Capital settled the NASD complaint with a payment of $125,000, towards which Collins contributed $25,000.

In June 2009, the SEC instituted proceedings against Brown, Collins and other employees of Prime Capital pursuant to the body of antifraud provisions in the Securities Act of 1933, the Securities Exchange Act of 1934 ("Exchange Act"), and the Investment Advisers Act of 1940. There followed decisions by an ALJ and by the Commission, in which, ironically, the Commission absolved Collins of one

charge of which the ALJ had found him liable, and lowered the "tier" of punishment, yet imposed a much heavier civil penalty. The ALJ found him liable as a primary violator of the antifraud provisions, but the Commission reversed that finding. On the substantive charge of failing "reasonably to supervise" Brown under Exchange Act §§ 15(b)(4)(E) and 15(b)(6)(A), the ALJ and the Commission agreed. Those sections create liability for a supervisor when his inadequate supervision is coupled with a violation by his supervisee. 15 U.S.C. §§ 78o(b)(4)(E), (b)(6)(A).

The ALJ and the Commission imposed (among other sanctions) a civil penalty under § 21B(a)(1) of the Exchange Act. *Id*. § 78u-2(a)(1). That provision authorizes a civil penalty in proceedings instituted pursuant to §§ 78o(b)(4) or 78o(b)(6) where the penalty is in the "public interest." Besides setting out six factors that the Commission "may consider," which we address shortly, the Act establishes three tiers of maximum penalties "for each act or omission" that violates the relevant securities laws, *id*. § 78u-2(b); two of the tiers are relevant in this case. Second-tier penalties may be imposed when the act or omission "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id*. § 78u-2(b)(2). Third-tier penalties may be imposed when, in addition, the act or omission "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who" violated securities laws. *Id*. § 78u-2(b)(3).

The ALJ found that Collins's acts satisfied the third-tier criteria, and imposed a single such penalty of $130,000. The Commission found that Collins was properly subject only to second-tier penalties. But it treated each of the five relevant sales as "distinct and separate" acts or omissions, resulting in five penalties aggregating $310,000. SEC Opinion at *60. It

also ordered him to disgorge $2,915, the total commissions on sales to two customers; it excused any disgorgement of the commissions (slightly exceeding $2000) paid by the two customers whose NASD claim Prime Capital had settled for $125,000, including $25,000 from Collins.

\* \* \*

Collins challenges the Commission's order on the grounds that (1) the Commission abused its discretion when it imposed a civil penalty of $310,000 without adequate explanation, see 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and (2) the civil penalty violates the Excessive Fines Clause of the Eighth Amendment. We consider these challenges in turn.

The statute requires that for a second-tier penalty the offense must have involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," 15 U.S.C. § 78u-2(b)(2); Collins concedes satisfaction of this requirement. He also concedes that the Commission could lawfully treat each unlawful transaction with a customer as a particular "act or omission." As for the "public interest," Congress guides the Commission's discretion by pointing to six factors: (1) "fraud," etc., i.e., the feature required to be present for a second-tier penalty; (2) the harm to other persons; (3) the extent of unjust enrichment (taking into account restitution paid); (4) previous SEC findings of the violations by the offender; (5) the need to deter the offender "and other persons"; and (6) a catch-all, "such other matters as justice may require." 15 U.S.C. § 78u-2(c).

The most serious strand of Collins's argument that the civil penalty was arbitrary or capricious is his characterization

of it as an unexplained departure from the Commission's practice of linking the penalty more closely with the disgorgement amount. Here, the civil penalty is over 100 times that amount ($2,915).

In his original brief Collins invoked a set of federal court cases with fairly close approximation between penalty and disgorgement amount. E.g., *SEC v. Yuen*, 272 Fed. Appx. 615, 618 (9th Cir. 2008) (district court "well within its discretion in setting the civil penalty equal to the disgorgement amount"); *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1193-94 (D. Nev. 2009) (setting penalty equal to disgorgement amount). The Commission argues in its response that the cases in this set were governed by a different statutory cap on civil penalties, § 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), which imposes ceilings (in various tiers) as the higher of a specified dollar amount (the same ceilings as under our statute) *or* the defendant's pecuniary gains (a figure that disgorgement is likely to track). The SEC's attempted distinction is unpersuasive: It is hard to see why, with the same numerical ceilings as those to which Collins was subject, the statute's permission to break out above the numerical ceiling in order to match the perpetrator's ill-gotten gains should result in a lower penalty-to-disgorgement ratio than would the statute covering Collins.

Nonetheless, Collins's use of the district court cases fails to show any discrepancy in his treatment as he makes no effort to hold constant the many other factors relevant to determining civil penalties, which are discussed below. Indeed, Collins's reply brief recognizes that the disgorgement amount is not the whole story, reframing his argument in far more general terms—as a contention that "there must be some sense of proportionality between the gain or injury and the penalties exacted." Reply Br. at 19.

In any event, in administrative proceedings before the SEC, procedurally akin to the present matter, we seem to observe civil penalties ranging from roughly one-half of the disgorgement amount, *In the Matter of Guy P. Riordan*, 2009 SEC LEXIS 4166, Admin. Proc. File No. 3-12829 (Dec. 11, 2009) (ordering disgorgement of $938,353.78 and civil penalty of $500,000), to about 25 times the disgorgement amount, *In the Matter of Maria T. Giesige,* Admin. Proc. File No. 3-12747, 2009 SEC LEXIS 1756 (May 29, 2009) (ordering disgorgement of $21,105.03 and civil penalty of $500,000). Thus, if we focus solely on the disgorgement amount, the civil penalty here looks high relative to SEC precedents.

The SEC tries a very broad defense of its action, citing statements in our cases to the effect that it need not follow a "'mechanical formula'" when crafting sanctions, *PAZ Secs., Inc. v. SEC*, 566 F.3d 1172, 1175 (D.C. Cir. 2009) (quoting *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1113 (D.C. Cir. 1988)), and that it is "not obligated to make its sanctions uniform," *Geiger v. SEC*, 363 F.3d 481, 488 (D.C. Cir. 2004). But for a court not to require uniformity or "mechanical formulae" is not the same as for it to be oblivious to history and precedent. Review for whether an agency's sanction is "arbitrary or capricious" requires consideration of whether the sanction is out of line with the agency's decisions in other cases. *Friedman v. Sebelius*, 686 F.3d 813, 827-28 (D.C. Cir. 2012).

Recognizing this, we nonetheless find that the penalty's relation to disgorgement does not render it arbitrary or capricious. First, the $2,915 disgorgement imposed directly on Collins understates his full disgorgement responsibility, as he was excused disgorgement of slightly more than $2000 in commissions because of the $25,000 he had contributed to

settlement of the NASD complaint brought by the customers involved.

Second, disgorgement obviously doesn't fully capture the "harm" side of the proportionality test that Collins's reply brief invites us to consider—"proportionality between the gain or injury and the penalties exacted." Full indicia of the injury inflicted by Collins and Brown, for example, include the entire $125,000 paid to settle the NASD complaint, of which Collins paid only $25,000.

Third, the statute seems to demand that the Commission look beyond harm to victims or gains enjoyed by perpetrators. It lists harm to other persons as only one of five specific factors (plus the catch-all reference to "such other matters as justice may require"). In that context, the relation between the civil penalty and disgorgement (and other measures of injury) is informative, particularly in comparison with other cases, but hardly decisive.

Looking more broadly, the Commission noted in its opinion, for instance, that Collins's violation was "egregious," and that he "displayed a blatant failure to deal fairly with elderly, unsophisticated customers and exhibited a clear disregard for . . . customers' interests." SEC Opinion at *59-60. This conclusion rested, in part, on the fact that Collins falsified documents and otherwise failed completely to supervise Brown, "creat[ing] an environment where Brown could defraud his clients with impunity." *Id*. at *42. And the Commission quite properly invoked the statutory interest in deterrence.

Collins mentions a number of additional factors that he believes militate in favor of a lesser penalty, such as his clean disciplinary record and his separate fine paid to the state of Florida. Each of these to some degree weighs in favor of

leniency, but neither separately or together do they take us across the border to where we might properly find that the SEC abused its discretion or acted arbitrarily or capriciously. We further note that, under Commission Rule 630(a), a party may present evidence of an inability to pay in "any proceeding" potentially requiring penalties. 17 C.F.R. § 201.630(a). Collins appears to have presented no such evidence.

\* \* \*

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. A civil penalty violates the Excessive Fines Clause if it "is grossly disproportional to the gravity of" the offense. *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The Second Circuit has elaborated *Bajakajian*'s proportionality standard into four factors: (1) the essence of the crime and its relation to other criminal activity; (2) whether the defendant fit into the class of persons for whom the statute was principally designed; (3) the maximum sentence and fine that could have been imposed; and (4) the nature of the harm caused by the defendant's conduct. See *United States v. Collado*, 348 F.3d 323, 328 (2d Cir. 2003) (per curiam), citing *Bajakajian*, 524 U.S. at 337-39; see also *United States v. Malewicka*, 664 F.3d 1099, 1104 (7th Cir. 2011). The SEC invokes these four factors, and Collins does not appear to object. We also note the Court's admonition that, though this is a constitutional inquiry, "judgments about the appropriate punishment for an offense belong in the first instance to the legislature," *Bajakajian*, 524 U.S. at 336.

Our rejection of Collins's claim that the Commission's decision was arbitrary and capricious goes most of the way to compelling rejection of the constitutional claim. A penalty

that is not far out of line with similar penalties imposed on others and that generally meets the statutory objectives seems highly unlikely to qualify as excessive in constitutional terms.

Although the four factors derived from *Bajakajian* hardly establish a discrete analytic process, we review them briefly to see if there are danger signals. There are not. First, for the reasons set forth above, Collins's violations of securities laws were grave, involving deceit to enable the fraudulent actions of Brown. Second, Collins fits within the class of persons for whom the statute was designed—an individual supervising persons subject to securities laws. Third, though Collins's penalty was at the upper end of the second-tier penalties, we cannot say that this is inappropriate. This factor mattered in *Bajakajian*. There, the defendant faced a maximum Sentencing Guidelines fine of $5,000 and six months in prison, which was well below the statutory maximum of $250,000 and five years in prison, suggesting that the forfeiture of $357,144 was excessive. *Bajakajian*, 524 U.S. at 339 n.14. Here, by contrast, we have indications that Collins may have been eligible for an even larger penalty, as suggested by the ALJ's application of a third-tier penalty. Fourth, Collins's actions enabled Brown's fraudulent actions, which targeted elderly customers considering complex financial products, with harm including withdrawal penalties of over $60,000 incurred by two of the victims. And the failures of supervision created a more general risk of wrongdoing in the office subject to Collins's supervision. Thus, consideration of the four factors does not really help Collins's cause.

We note that Collins cites only two cases in which courts have set aside a fine for violating the Eighth Amendment, both featuring extremely large penalties contrasted with minimal harm. *Bajakajian*, 524 U.S. at 339 (1998) (holding invalid forfeiture of $357,000 for failing to report exported

currency, "affect[ing] only . . . the Government, and in a relatively minor way"); *United States ex rel. Bunk v. Birkart Globistics GmbH & Co.*, 2012 WL 488256, at *5 (E.D. Va. Feb. 14, 2012) (invalidating penalty of $50 million for False Claims Act violations when no showing of resulting economic harm). The Commission's penalty here does not belong in that small club.

\* \* \*

The order of the Commission is therefore

*Affirmed.*