[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10984

Non-Argument Calendar

_____

U.S. SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Counter Defendant
-Appellee,

*versus*

REVOLUTIONARY CONCEPTS, INC.,

Defendant,

SOLOMON RC ALI,
a.k.a. Richard M. Carter,

Defendant-Third Party Plaintiff
-Counter Claimant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-01832-RWS

_____

Before BRANCH and LUCK, Circuit Judges.*

PER CURIAM:

The Securities and Exchange Commission sued Solomon RC Ali—formerly known as Richard Carter—for issuing press releases with materially false or misleading statements, in violation of the Securities Act of 1933, the Exchange Act of 1934, and Commission regulations. The district court entered summary judgment for the Commission and enjoined Ali from either serving as an officer or director or from working in the "penny stock" industry for ten years. The district court also imposed a six figure fine. After careful review, we affirm.

---

* This opinion is being entered by a quorum pursuant to 28 U.S.C. § 46(d).

## FACTUAL BACKGROUND

### The Ali Trusts

In 2009, Ali created seven irrevocable trusts and designated his attorney, Ernest "Woody" DeLong, as the trustee for each. Six of the seven trusts benefitted either Ali, his close relatives, or both.[1] Rainco Holdings Trust, the trust most central to this case, listed Ali as its primary beneficiary and his daughter as its secondary beneficiary. Ali did not create the trusts with any assets in them. Between 2013 and 2015, the individual trusts' ending monthly balances were less than $10,000 (at the highest) and usually less than $1,000.

Ali created Rainco Industries, Inc. in 2011. His daughter was a director, his girlfriend was the president of operations, his lawyer (DeLong) was its general counsel, and its majority shareholder was Rainco Holdings Trust. Ali lived at the same address as Rainco Industries's principal place of business. So, just to recap, Rainco Holdings Trust, which benefitted Ali, owned Rainco Industries.

### Revolutionary Concepts

In mid-2010, Ali became the senior vice president of investor relations and a board member of a publicly traded company named Revolutionary Concepts, Inc., also known as "REVO." As a signing bonus, Ali got almost three million shares of REVO stock. At the time, REVO was a small company, with just two full-time

---

[1] The seventh trust benefitted three charities picked by Ali.

employees—Ronald Carter[2] and Ali.  Although REVO owned patents for "smart camera" technology, it generated no revenue and its stock traded at less than one cent per share.

Ali's role was to "arrange capital" and "funding" for the company and to "increase REVO's market capitalization."  He described his job as "[introducing] Mr. Carter to various people, [and] set[ing] up various conference calls with, uh, different private equity companies, companies that would loan [] money[.]"  Ali bragged about his experience and talent with mergers and acquisitions:  he said that he had done over one hundred and forty mergers and acquisitions over the previous twenty-year period, and, in his opinion, "there[] [was] nobody better."  REVO's 2012 10-K filing described Ali as having experience in "corporate valuation, capitalization structure . . . and managing the investment process with securities attorneys and accountants[] for [the] SEC[.]"  Ali also wrote the press releases for REVO, including the ones for the four transactions at issue in this case:  (1) the acquisition of Greenwood Finance; (2) the licensing agreement with EyeTalk; (3) the line of credit from Rainco Industries; and (4) the loan from Universal Bioenergy.

*Greenwood Finance Transaction*

In November 2012, DeLong created Greenwood Finance Group, LLC, whose sole member was Rainco Industries.  Greenwood Finance was wholly owned by Rainco Industries (which was

---

[2] No relation to Ali (formerly known as Richard Carter).

owned by Rainco Holdings Trust, which benefitted Ali). Green-wood Finance's only assets were seven promissory notes issued by the Ali trusts. Those promissory notes required the Ali trusts to pay Greenwood Finance $7.1 million in principal and to make annual interest payments of about $1 million.

A month after Greenwood Finance was created by Ali's lawyer, in December 2012, Ali—REVO's senior vice president and board member—proposed that REVO buy Greenwood Finance. Ali did not do any diligence on Greenwood Finance either before proposing the deal or before it was executed. REVO paid Rainco Industries ten million shares of REVO stock in exchange for Greenwood Finance. While REVO stock was then trading at a fraction of a penny, Ali valued REVO's stock at $1.80 per share; so, in total, REVO purported to transfer $18 million worth of REVO stock and an annual dividend of $1.8 million to Rainco Industries in exchange for Greenwood Finance and its $7.1 million in promissory notes (and annual million dollar interest payments).

Ali was on both sides of the deal. For REVO, he was a director, senior vice president, and a shareholder. For Rainco Industries, he was the beneficiary of Rainco Holdings Trust, which owned a fifty-five percent stake in Rainco Industries. Ali's mother owned another eleven percent of Rainco Industries. And, of course, Ali's trusts provided the promissory notes which constituted Greenwood Finance's only assets.

While REVO's board of directors—including Ali—approved REVO's acquisition of Greenwood Finance from Rainco

Industries, Ali never disclosed either that he benefitted from REVO buying Greenwood Finance or that he and his family benefitted from whatever Rainco Holdings received. Rainco Industries's board of directors also approved the deal; Ali's daughter signed as secretary, his girlfriend signed as a director, and "Richard Carter"— Ali's former name—signed as a director. The agreement was signed on December 7, 2012.

Ali wrote three press releases for REVO that were published to the market and boasted about acquiring Greenwood Finance. The first, published the day before the deal was signed, claimed, in a quote attributed to Ali, that REVO believed "the acquisition could be valued at greater than $15 million. The company being evaluated has a current EBITDA[3] in excess of $1 million." The second, published a few weeks later on January 4, 2013, was even rosier—it said that Greenwood Finance had an EBITDA "in excess of [$]3.5 million for 2012 and assets of $7 million with total liabilities of less than $3 million." And the third, released on January 9, 2013, claimed that Greenwood Finance had "[$]3 million in profits from 2012" and was "set to exceed its 2012 funding revenue."

At no point, though, did Ali disclose that Greenwood Finance's ability to generate revenue depended on receipt of funds from the promissory notes and that the trusts had no ability to

---

[3] This stands for "Earnings Before Interest, Taxes, Depreciation, and Amortization"—a common accounting measure. *Cox Enter., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1264 n.11 (11th Cir. 2015).

make the payments—in fact, Greenwood Finance had *no* revenue in 2012. Ali did not know the amount of the trusts' assets at the time of the transaction and made no attempt to find out. Nor did he disclose that he was the beneficiary of the trust which received the REVO stock.

In June 2014, Ali issued two more press releases stating that Greenwood Finance (now owned by REVO) was meeting with its "original investors" to collect on the "seven million dollars in receivables." Ali did not disclose (again) that the "original investors" were his trusts.

### EyeTalk Licensing Agreement

In February 2014, Ali had another idea—to license REVO's patents to a newly-formed company named EyeTalk365, LLC. EyeTalk was incorporated in September 2013 for the purpose of licensing REVO's patents. Ali's trusts and Rainco Industries owned a little less than forty percent of EyeTalk when it was created. EyeTalk's founding members were supposed to provide one million dollars in assets but never did.

Ultimately, EyeTalk paid[4] REVO $900,000 to license REVO's patents. Ali was on both sides of this deal too. He was

---

[4] It is more complicated than that—in reality, REVO issued $500,000 and $400,000 in promissory notes to Ali and Ronald Carter as payment. Ali then donated the note to one of his trusts, which in turn gave the notes to EyeTalk in exchange for a 19% ownership stake. Ronald Carter did the same. Then, REVO cancelled the $900,000 in notes as consideration for the license

REVO's senior vice president and a director, and one of his trusts partially owned EyeTalk.

On February 12, 2014, Ali drafted and issued a press release announcing the deal and boasting that REVO "project[ed] the transaction could generate millions in long-term revenues" through licensing and that it would receive an "up-front sign-up fee or pre-commercialization fee of $900,000 in consideration." That same day, REVO published another press release forecasting $20 million to $30 million in total estimated annual revenues—of which forty percent (or eight to twelve million dollars) would go back to REVO.

When asked, Ali admitted that he had no documents to support the valuation. Ali's justification was that the relevant industry was "84 billion dollars" and "if we're lucky, we will get about .001 to .005 percent" of the industry. In fact, the deal earned nothing in 2014 and only $77,000 in 2015. Ali didn't mention in either press release that the transaction was not arms-length. After announcing the deal, REVO's stock almost tripled in value—rising 182 percent.

*Rainco Industries Line of Credit*

In June 2014, Greenwood Finance—through Ali—negotiated a ten-million dollar line of credit from Rainco Industries. Ali did not do any diligence to see if Rainco Industries had any money (let alone ten million dollars) to lend. Nor did Greenwood Finance

---

agreement. But for our purposes, the deal was that EyeTalk gave REVO $900,000 for a license, although no money actually changed hands.

have any assets (other than the promissory notes from the Ali trusts) to offer as collateral.

Ali wrote a press release for REVO trumpeting that the agreement would "fund its revitalized investment operations" and "position[ed] Greenwood [Finance] for a joint venture opportunity with a firm seeking a private equity partnership with a strong data base." A few weeks later, on July 2, 2014, Ali wrote and published a second press release which quoted him as estimating "$5 million in annual profits" from the new credit line and saying that it would "generate returns of 100% or more" and forecasted annual revenues "in the $10 to $20 million range." Ali didn't disclose that he was a beneficiary of the lender or that the lender had no capital to loan.

### Universal Bioenergy Loan

In January 2015, the Ali trusts had not made their required interest payments to Greenwood Finance and owed around one million dollars. For funds, Ali arranged for his trusts to transfer convertible promissory notes issued by Universal Bioenergy, Inc.—a separate company in which he was the senior vice president for finance and investor relations and also a director—to Greenwood Finance in lieu of cash. Although the notes had a face value of $200,000—which was less than the $1,000,000 the Ali trusts owed—REVO never collected any revenue from the notes because Universal Bioenergy had less than $15,000 in assets and less than $500 in cash on hand.

Ali wrote and published another press release shortly after the transaction proclaiming that REVO could "announce early income and revenue recognition for the first month of the first quarter [of] 2015. Income from a series of transactions recorded this month have a cash value that may well exceed one million dollars." Ali—through REVO—did not disclose his relationship with Universal Bioenergy.

## PROCEDURAL HISTORY

Eventually, the Securities and Exchange Commission began investigating Ali and his co-defendants but wanted more time to reach a settlement. On August 1, 2017, Ali signed a six-month tolling agreement with the Commission excluding the time between July 24, 2017 and January 23, 2018 from the five-year time period to file suit.

After settlement talks collapsed, the Commission brought an eleven-count complaint in April 2018 alleging that Ali had violated the Securities Act of 1933, the Exchange Act of 1934, and Commission regulations. Only five counts are at issue here.[5] Count one charged Ali with violating section 17(a)(1) of the Securities Act for "acting with scienter . . . in the offer or sale of securities" by making misrepresentations and omissions regarding the four transactions. Count two similarly alleged that Ali violated section 17(a)(2)–(3) of the Securities Act by "acting knowingly,

---

[5] The other counts were either directed at different defendants or were dismissed by the Commission.

recklessly, or negligently in the offer or sale of securities" by making material misstatements. Count three alleged that Ali violated section 10(b) of the Exchange Act and rules 10b-5(a)–(c) by making material misstatements and omissions in connection with the offering of securities. Count five charged Ali with aiding and abetting the other violations. And count nine claimed that Ali had violated the beneficial ownership reporting requirements of section 16(a) of the Exchange Act and rule 16a-3.

Ali initially proceeded pro se in the district court. After answering, he filed two motions to dismiss—one of which argued that the statute of limitations had run on his alleged misstatements. Before the district court ruled on the motions, the Commission moved for partial summary judgment on liability, arguing that there was no genuine dispute that Ali violated the Securities Act, the Exchange Act, and Commission regulations.

The district court granted summary judgment for the Commission on the five counts and denied Ali's motions to dismiss as moot. The district court found no genuine dispute that Ali's statements were "material"—likely to mislead a reasonable investor—and false. The district court also concluded that there was no dispute of fact that Ali had acted with the required mental state—"scienter"—because there was no factual basis for his press releases.

The Commission asked the district court to permanently bar Ali from violating the securities laws, from serving as an officer or director of a publicly traded company, and from participating in the

offering of a penny stock. It also asked the court to fine Ali $150,000 for the press releases and $7,500 for the reporting violations.

The district court declined to award all the relief requested. Instead, it: (1) permanently enjoined Ali from engaging in future securities law violations (which Ali consented to); (2) banned Ali for ten years from serving as an officer or director of a publicly traded company and from working in the penny stock business; and (3) fined Ali $107,500. The district court explained that Ali was a "key player" in the fraud and "lack[ed] contrition" but balanced those facts with the mitigating factors that Ali had no prior securities law violations, was older (fifty-seven years old at the time), and had worked in the securities industry for many years.

## STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment, viewing the evidence and all factual inferences in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). A district court should grant summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review constitutional challenges de novo. *United States v. Bajakajian*, 524 U.S. 321, 336 (1998). And we review the district court's choice of remedies for a securities law violation for an abuse of discretion. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004) (injunctive relief); *SEC v. Warren*, 534 F.3d 1368, 1369 (11th Cir. 2008) (monetary relief).

"Ordinarily an appellate court does not give consideration to issues not raised below" but, "[i]n an exceptional civil case, we might entertain the objection by noticing plain error. Under the civil plain error standard, we will consider an issue not raised in the district court if it involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice." *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1352 (11th Cir. 2017).

## DISCUSSION

Ali makes five arguments on appeal. First, he argues that the complaint was time-barred because the five-year limitations period was a statute of repose and could not be tolled by agreement. Second, he contends that the district court violated his due process (Fifth Amendment) and jury trial (Seventh Amendment) rights by finding him liable at summary judgment instead of after a jury trial. Third, he maintains that the Commission's burden to prove the violations should have been by clear and convincing evidence rather than a mere preponderance of the evidence. Fourth, he argues that there was a genuine issue of material fact as to whether he had the scienter required for liability on counts one, three, and five. And fifth, he says that the district court abused its discretion by banning him for ten years from working as an officer or director or offering penny stocks and in fining him $107,500. As to the fine, Ali argues that it violated his Eighth Amendment right to be free of excessive fines.

*Statute of Limitations*

First, Ali argues that the Commission's complaint was untimely. In his view, the five-year limitations period to file suit—28 U.S.C. section 2462—is a statute of repose and not subject to tolling. Therefore, he says, the Commission had only five years from when the claims accrued—January 9, 2013—to file suit because his signed "tolling agreement" couldn't toll a statute of repose. Because the Commission filed suit on April 27, 2018—more than five years later—Ali argues that it was untimely. The Commission responds that section 2462 is a statute of limitations, which can be tolled, and so Ali's tolling agreement made its complaint timely. We agree with the Commission.

The Supreme Court has differentiated between statutes of limitations—which are an affirmative defense and are subject to forfeiture and waiver—and statutes of repose, which are jurisdictional and not subject to waiver. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008). A statute of limitations, the Court has said, is based on the date "when the claim accrued," which usually means "when the injury occurred or was discovered." *CTS Corp. v. Waldburger*, 573 U.S. 1, 7–8 (2014) (cleaned up). A statute of repose, on the other hand, "is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant . . . even if this period ends before the plaintiff has suffered a resulting injury." *Id.* at 8 (cleaned up). There is a presumption that time limitations are statutes of limitations, and not repose, absent a "clear indication

21-10984                 Opinion of the Court                      15

that Congress wanted the rule to be jurisdictional." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435–36 (2011) (cleaned up).

Section 2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise shall not be entertained unless commenced within five years from the date when the claim first accrued," as long as "the offender or the property is found within the United States in order that proper service may be made thereon." 28 U.S.C. § 2462.[6] For two reasons, we conclude that section 2462 is a statute of limitations and not a statute of repose.

First, section 2462 refers to the date that the claim accrues. 28 U.S.C. § 2462 ("[A]n action . . . shall not be entertained unless commenced within five years from the date when the claim first *accrued*[.]") (emphasis added). This strongly suggests that section 2462 is a statute of limitations. *See CTS Corp.*, 573 U.S. at 8 ("In the ordinary course, a statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued.'" (quoting Black's Law Dictionary 1546 (9th ed. 2009)); *see Nat'l Cred. Union Admin. Bd. v. Barclays Cap., Inc.*, 785 F.3d 387, 394 (10th Cir. 2015) ("Second, and dispositively, the Extender Statute

---

[6] Because this statute applies only to penalties, not injunctions, this argument applies only to Ali's civil penalty. *Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017); *SEC v. Graham*, 823 F.3d 1357, 1360 (11th Cir. 2016).

repeatedly refers to the date a claim accrues. This is consistent with a statute of limitations but not a statute of respose[.]").

Second, a statute of repose is jurisdictional and the Supreme Court has "emphasized—repeatedly—that statutory limitations periods and other filing deadlines are ordinarily not jurisdictional and that a particular time bar should be treated as jurisdictional only if Congress has clearly stated that it is." *Sec'y, U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 881 (11th Cir. 2017) (internal quotations omitted). Congress knows how to indicate a statute of repose when it wants to, and absent a clear indication that section 2462 was intended to be jurisdictional, we won't construe it that way. *See United States v. Wong*, 575 U.S. 402, 409 (2015) (describing the "high bar" to establish a time limitation as jurisdictional). There is no such evidence here.

Our conclusion is consistent with the Supreme Court's description of section 2462 as a statute of limitations. *See Kokesh*, 137 S. Ct. at 1642 ("The statute of limitations at issue here—28 U.S.C. [section] 2462 . . ."). It also is consistent our description of section 2462 as a statute of limitations. *See Nat'l Parks and Conservation Ass'n v. Tenn. Valley Auth.*, 502 F.3d 1316, 1332 (11th Cir. 2007) ("Legal claims brought under the Clean Air Act are subject to the general federal five-year *statute of limitations* established by 28 U.S.C. [section] 2462, wherein the claim is barred if suit is not brought within five years of the date the *claim first accrues*." (emphasis added)). And it is consistent with what every other circuit to consider the issue has said. *See, e.g., United States v. Core Labs.,*

*Inc.*, 759 F.2d 480, 484 (5th Cir. 1985) (describing section 2462 as subject to equitable tolling); *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 669 (4th Cir. 1997) (describing section 2462 as a statute of limitations which may be raised or waived as an affirmative defense); *Fed. Elec. Comm'n. v. Williams*, 104 F.3d 237, 240 (9th Cir. 1997) (noting that section 2462 is subject to equitable tolling); *SEC v. Fowler*, 6 F.4th 255, 262 (2d Cir. 2021) ("[Section] 2462 is a non-jurisdictional statute of limitations.").

Ali's arguments to the contrary are not persuasive. First, Ali argues that section 2462 provides an exception to its five-year limit: when the offender or property is not "found within the United States." But Ali doesn't explain why this would be relevant to whether the provision is a statute of repose. It's not.

Second, he argues that when the Commission files a civil action seeking a civil penalty, "it is functionally the equivalent of a private plaintiff." Therefore, he says, the five-year time period in section 2462 should be construed similarly to the time period for the private cause of action for securities violations in section 1658(b)(2), which is a statute of repose.

But Ali's premise is wrong. "When the SEC sues to enforce the securities laws, it is vindicating public rights and furthering public interests, and therefore is acting in the United States's sovereign capacity." *SEC v. Diversified Corp. Consulting Grp.*, 378 F.3d 1219, 1224 (11th Cir. 2004), *abrogated on other grounds by Kokesh*, 137 S. Ct. at 1645. His attempt to analogize section 2462 to the

corresponding time limitations period for private actions is thus unavailing.

Because section 2462 is nonjurisdictional, Ali's tolling agreement extended the time to file suit.  Under the tolling agreement, the complaint here was timely.

### Summary Judgment

Ali next argues that the district court's summary judgment violated his Fifth Amendment due process rights and his Seventh Amendment right to a trial by jury.  Because Ali did not make these arguments to the district court, we review only for plain error.

### Fifth Amendment Due Process Claim

Due process "is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (cleaned up).  The nature of the process required "is shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Califano v. Yamasaki*, 442 U.S. 682, 696 (1979) (internal citations omitted).  "The essential requirements of due process . . . are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  We've held that due process does not require more than the summary judgment rule requires. *See Oglesby v. Terminal Transport Co., Inc.*, 543 F.2d 1111, 1113 (5th Cir. 1976) ("Rule 56 requires due notice of the invocation of its procedures and outlines the type of response required to avoid its strictures.  [Appellant] does not dispute that he got this notice.  Indeed, his counsel prepared a response supported by a

21-10984                Opinion of the Court                19

brief and [appellant's] unsworn statement.  Due process does not require more.").

Ali complains that he did not get "assistance of counsel" or "an oral hearing."  But neither are required for due process in this case.  "A plaintiff in a civil case has no constitutional right to counsel."  *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999).  And, while a court may appoint counsel, Ali never requested pro bono counsel and instead elected to proceed pro se until the remedy phase.

As to Ali's demand for an oral hearing, the Supreme Court has explained that "[t]he opportunity to present reasons, either in person or *in writing*, why proposed action should not be taken is a fundamental due process requirement."  *Loudermill*, 470 U.S. at 545 (emphasis added); *Erco Indus., Ltd. v. Seaboard Coast Line R.R. Co.*, 644 F.2d 424, 431 (5th Cir. Unit B. May 1981) ("Although Rule 56 requires notice to an adverse party and a hearing, the hearing need not be an oral or formal evidentiary hearing."); *Mathews*, 424 U.S. at 348 ("The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances.").  Here, Ali had the opportunity to—and did—respond to the Commission's summary judgment motion in writing.  Nothing about the summary judgment procedure violated Ali's due process rights.

### Seventh Amendment Jury Trial Right Claim

Ali contends that granting the Commission's motion for summary judgment deprived him of his right to a jury trial as

guaranteed by the Seventh Amendment.  But the Supreme Court "made clear long ago" that a jury trial is unnecessary "when the pertinent facts are obvious and indisputable from the record and the only remaining truly debatable matters are legal questions that a court is competent to address." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920 (11th Cir. 2018) (cleaned up).  In other words, if the district court views the evidence in the light most favorable to the nonmoving party, it "does not intrude on the constitutional role of the jury when it considers whether a complaint fails as a matter of law." *Id.*

### Burden of Proof

Ali also argues that the Commission should be held to a higher burden of proof in civil enforcement actions.  According to Ali, because the punishments imposed—the ten year bans and a $107,500 fine—were so severe, they were "quasi-criminal" and the Commission should have to prove the violations by clear and convincing evidence.  Because Ali did not make this argument to the district court, we review only for a miscarriage of justice.  *See Burch*, 861 F.3d at 1352.

There was no miscarriage of justice in applying the preponderance of the evidence standard.  The Supreme Court has "required proof by clear and convincing evidence where particularly important individual interests or rights are at stake." *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983).  But "imposition of even severe civil sanctions that do not implicate such interests" do not require the heightened level of proof.  *Id.*  The

21-10984                Opinion of the Court                21

Supreme Court has, thus, affirmed using the preponderance of the evidence standard for violations of the Securities Act and the Exchange Act. *See Huddleston*, 459 U.S. at 390 (section 10(b)); *SEC v. C.M. Joiner Leasing*, 320 U.S. 344, 355 (1943) (section 17(a)).

In response, Ali falls back on the policy argument that, because the proceeding was civil and he received neither appointed counsel nor a jury, "the minimally acceptable course would be to elevate the burden of proof[.]" But that route is foreclosed by Supreme Court precedent.

### *Scienter*

Ali next argues that there is a genuine issue of material fact as to his scienter. Ali was found liable for violating section 17(a)(1) of the Securities Act (count one), section 10(b) of the Exchange Act and its corresponding rule 10b-5 (count three), and aiding and abetting violations of the two statutes and the rule (count five). All three counts require a showing of "scienter." *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007).[7]

"Scienter is 'a mental state embracing the intent to deceive, manipulate, or defraud.'" *ZPR Inv. Mgmt., Inc. v. SEC*, 861 F.3d 1239, 1252 (11th Cir. 2017) (quoting *Matrixx Initiatives, Inc. v.*

---

[7] Ali concedes there were no genuine issues of material fact as to the other elements—just scienter. Ali also doesn't dispute that he was negligent as required for liability for counts two or nine: violating section 17(a)(2)–(3) by negligently making misstatements in connection with the offering of securities and violating section 16(a) by failing to disclose beneficial ownership of stock as required by regulation.

*Siracusano*, 563 U.S. 27, 48 (2011)). "Scienter may be established by a showing of knowing misconduct or severe recklessness." *SEC v. Monterosso*, 756 F.3d 1326, 1335 (11th Cir. 2014) (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982)).

"Proof of recklessness requires a showing that the defendant's conduct was an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (alterations adopted). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1282 n.18 (11th Cir. 1999)). And "while scienter is an issue ordinarily left to a trier of fact, there are cases where summary judgment is appropriate"—where there is no genuine dispute that the defendant intended to deceive or was severely reckless. *See Montessorsso*, 756 F.3d at 1335.

The district court correctly granted summary judgment because there was no genuine dispute that Ali intended to deceive or was severely reckless in publishing the nine false and misleading press releases pumping up the four REVO transactions. For example, Ali issued press releases stating that Greenwood Finance had an EBITDA of $3.5 million for 2012. But Greenwood Finance was created in November 2012 and the summary judgment evidence

showed that it had *no* revenue in 2012. Nor did Ali make any attempt to find out what Greenwood Finance's revenue was before telling the market it was millions of dollars. No rational jury could conclude that was anything other than severely reckless.

And Ali described the Greenwood Finance line of credit with Rainco Industries as a "$10 million line of credit" and that it would "generate returns of 100% or more" with annual revenues "in the $10 to $20 million range." But Ali did not disclose that (i) Rainco Industries did not actually have any money to lend to Greenwood Finance, (ii) Greenwood Finance was not actually engaging in any business, and that (iii) Ali was on both sides of the non-arms-length transaction. The failure to tell the public about these material facts shows an intent to deceive.

And, as to the loan from Universal Bioenergy, Ali told the public that "income from a series of transactions recorded this month have a cash value that may well exceed one million dollars." Ali also told the Commission in a public filing that "[t]he subsidiary [Greenwood Finance] collected payments consisting of cash equivalents valued at approximately $1.2 million dollars." But, in reality, the "cash equivalents" were convertible promissory notes from Universal Bioenergy, a company with $342 in cash and $13,453 in assets at that time. The Commission's unrebutted expert evidence showed that the $1.2 million dollar valuation was "speculative and unreliable" considering Universal Bioenergy's assets and trading activity. The expert also testified that the press release was misleading because Ali failed to disclose that he was a board member

of both companies and therefore conflicted from valuing the notes. Because Ali was a board member of both companies, he knew (or should have known) that Universal Bioenergy didn't have the money to lend.  No reasonable jury could believe that Ali acted with anything less than severe recklessness.

Ali makes three arguments in response.  First, he says that his statements, rather than being attempts to defraud, were just overly optimistic projections.  But Ali wasn't sanctioned for being wrong in projecting the future.  He was held liable because he lied to—or was severely reckless in reporting to—the public that Greenwood Finance and Universal Bioenergy had more money than he knew they did.

Second, Ali argues that the fact that he didn't profit from the four transactions is circumstantial proof that he lacked the intent to defraud investors.  But "[t]he fact that [Ali] did not intend to harm investors does not negate a finding of scienter." *See SEC v. Caterinicchia*, 613 F.2d 102, 106 n.7 (5th Cir. 1980).  Instead "intentional deception clearly satisfies the scienter requirement which this court has applied to SEC injunctive actions." *Id.*  Scienter can be found in the deliberate decision not to disclose a material fact. *ZPR Inv. Mgmt.*, 861 F.3d at 1254–55.

Here, Ali made the deliberate decision not to disclose material facts.  He knew that he was on both sides of the four transactions.  He didn't disclose that.  He knew that his projections were not supported by any documentary evidence.  He didn't disclose that.  He also made objectively false statements to investors—for

example, making up, out of whole cloth, Greenwood Finance's EBITDA, or saying that REVO had received a $900,000 "up-front sign-up fee" from EyeTalk when he knew no money had changed hands. In sum, that Ali didn't intend to harm investors is wholly separate from the fact that—as the undisputed summary judgment evidence makes plain—he intended to deceive them.

Finally, Ali argues that his failure to disclose the related-party nature of the transactions is not "per se" evidence of scienter. But failure to do so is "classic"—even if not per se—"evidence of scienter." *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or mis-leadingly incomplete is classic evidence of scienter.").

Because the summary judgment evidence shows that Ali made knowingly false—and admittedly material—misrepresenta-tions to the public, the district court did not err in entering sum-mary judgment against him.

## Penalties

Finally, Ali challenges both (1) his ten-year bars from work-ing as an officer or director and from working for "penny stock" companies and (2) his monetary penalty of $107,500. He also con-tends that the penalty was an excessive fine in violation of the Eighth Amendment.

Time Bars

As to his time bars, Ali argues that the district court abused its discretion because it was his first time violating securities laws and he "now understands that his beliefs [about the law] were mistaken." The district court, he says, ignored the mitigating factors that he didn't benefit from the fraud and that all four transactions were related to a single "two-year" campaign to maintain investor interest in REVO. And he contends that the court should have imposed a five-year bar like those imposed on his co-defendants and "more culpable" defendants in other cases.

The district court did not abuse its discretion. "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *United States v. Harris*, 989 F.3d 908, 911 (11th Cir. 2021) (citation omitted). In the context of injunctive relief—like a time bar—a court should weigh the likelihood that the wrong will be repeated. *Calvo*, 378 F.3d at 1216. Factors to consider are: "[1] [the] egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of scienter involved, [4] the sincerity of the defendant's assurances against future violations, [and 5] the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Id.*

Here, the district court identified the correct legal standard and considered the defendant's conduct. The district court found

that Ali had issued not one but nine false and misleading press releases, played a significant personal role in the scheme, found scienter, and noted that Ali had failed to accept responsibility for his conduct.  It also considered that Ali was a first time offender and that Ali was fifty-seven.  Under an abuse of discretion review, we're not going to reweigh the district court's consideration of the aggravating and mitigating factors.  Ultimately, when we review for abuse of discretion, it "means that the district court had a 'range of choice' and that we cannot reverse just because we might have come to a different conclusion had it been our call to make." *Harris*, 989 F.3d at 912.

### Civil Fine

As to the fine, the district court could fine Ali $5,000 for a "first tier" violation of a securities law.  15 U.S.C. §§ 77t(d)(2), 78u(d)(3).  For a second tier violation—if the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard—then the penalty increases to $50,000 per violation.  *Id.*  For a third tier penalty of up to $100,000, the court must find a second tier violation *and* that the violation "resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  Here, the district court found four "Tier 3" violations—one for each of the four transactions—and

noted that it could likely punish Ali for all nine press releases, but chose not to. The district court imposed a $107,500 civil penalty.[8]

Ali argues that the district court abused its discretion because it did not consider the fact that he hadn't caused investors any actual loss. But actual loss isn't required. The district court could assess a third tier fine even if it found "a significant risk of substantial losses." 15 U.S.C. § 77t(d)(2)(C)(ii). That's what the district court found here.

Ali also argues that his misleading press releases didn't create a risk of harm to investors because investors "cannot be presumed to place [] faith and reliance" on them. But Ali conceded that his misstatements were material—that "a reasonable investor, in the exercise of due care, would have been misled" by them. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019) (citation omitted). And investors were misled by the misleading press releases. After announcing the EyeTalk deal, for example, REVO's stock soared 182 percent. In short, we see no reason why the district court abused its discretion in choosing and imposing the third tier monetary penalty.

### Eighth Amendment Challenge

Lastly, Ali argues that the monetary penalty—and the ten year bars—violate the Eighth Amendment because they are disproportionate and "wholly arbitrary" as applied in his case. Because

---

[8] A small portion—$7,500—is for Ali's violation of his reporting requirements which Ali doesn't challenge on appeal.

Ali did not make this argument to the district court, we review it for plain error. *See Burch*, 861 F.3d at 1352. Here, there was no error, plain or otherwise.

A fine is excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. "Given that excessiveness is a highly subjective judgment, the courts should be hesitant to substitute their opinion for that of the people." *United States v. 817 N.E. 29th Drive, Wilton Manors, Fla.*, 175 F.3d 1304, 1309 (11th Cir. 1999).

Ali says only that his fine is excessive because no investor was harmed and he didn't benefit from his misconduct. But that is not the end of the story. Whether a fine is excessive is relative to the wrongdoer's culpability, the harm to the victim, and sanctions for comparable misconduct by other defendants. *Bajakajian*, 524 U.S. at 336–39.

Here, Ali was the most culpable of his co-conspirators because he was the one who made the false and misleading misstatements to the public. Ali was a principal driver of the fraud: the transactions at issue were, as he admitted at his deposition, *his* idea. The victims were harmed when they bought REVO's stock based on Ali's misrepresentations. And similar fines are routinely affirmed for similar violations of the Securities Act and the Exchange Act. *See, e.g.*, *Collins v. SEC*, 736 F.3d 521 (D.C. Cir. 2013) (affirming $310,000 fine for violating section 15(b) of the Exchange Act against an Excessive Fines Clause challenge); *ACAP Fin., Inc. v. SEC*, 783 F.3d 763, 766 (10th Cir. 2015) (Gorsuch, J.) (affirming

$100,000 fine and noting that "the agency has in the past approved sanctions that greatly exceed[ed] any profit earned by the party to be disciplined"). On this record, we will not substitute our judgment for that of Congress when it set the fine for $100,000 for *each* misleading press release and, here the district court imposed a $100,000 fine for all *nine*.

Ali's contention that his time-bar injunctions violate the Eighth Amendment is frivolous. We've already said that injunctions are "equitable, forward-looking remedies and are not penalties" subject to the Eighth Amendment. *Graham*, 823 F.3d at 1362. *See Gabelli v. SEC*, 568 U.S. 442, 451–52 ("[T]his case involves penalties, which go beyond compensation, are intended to punish, and label defendants wrongdoers."); *Tull v. United States*, 481 U.S. 412, 422 (1987) (holding that penalties are "intended to punish culpable individuals," not "to extract compensation or restore the status quo.").

AFFIRMED.